CITY OF DENVER et al. v. SHERRET.

(Circuit Court of Appeals, Eighth Circuit. June 27, 1898.)

No. 1,061.

1. CITIZENSHIP—CHANGE OF DOMICILE.
   Plaintiff, who had always resided in Kansas, as a member of her father's family, went to Denver, Colo., where she took an examination for the position of teacher in the schools, intending, if successful, to remain there, but, if not, to return to Kansas. Before the result of her examination was known, she was seriously injured, and, when sufficiently recovered, returned to her father's home, in Kansas, where she remained. *Held,* that she did not cease to be a citizen of Kansas.

2. MUNICIPAL CORPORATIONS—ELECTRIC LIGHT POLES IN STREETS—LIABILITY FOR DEFECTS.
   A city, by authorizing the erection by an electric light company of poles and wires in the streets, does not become chargeable with the duty of inspecting such structures, and maintaining them in a safe condition for the protection of persons using the streets for travel, to the same extent as though it had itself erected them; but its duty extends only to a general supervision over the light company, and it is liable for injuries caused by defects only when it has been negligent, after actual or constructive notice of such defects. Thayer, Circuit Judge, dissenting.

3. PARTIES—JOINDER OF DEFENDANTS—MOTION TO REQUIRE ELECTION.
   Where an action was brought against a city and an electric light company as jointly liable for an injury to plaintiff, and no objection to the joinder was taken by motion or demurrer, but defendants both answered, a motion made when the cause came on for trial to require plaintiff to elect which defendant she would proceed against was, in effect, a motion for separate trials; and, being addressed to the discretion of the court, its ruling thereon is not reviewable.

4. ELECTRIC LIGHT COMPANY—LIABILITY FOR DEFECTIVE POLE—INSTRUCTIONS.
   An instruction that it is the duty of an electric light company having poles in the streets to make such inspection of them, "from time to time, as will determine and ascertain whether decay has taken place to such an extent as to render the timber unfit for use," is misleading, where the defect shown by the evidence was not visible from the outside, as apparently requiring that the inspection must be effectual and going beyond the ordinary requirement of reasonable and ordinary care.

5. SAME—NOTICE OF DEFECT—KNOWLEDGE OF EMPLOYE.
   The discovery of a defect in an electric light pole by an employé of the company while in the line of his employment, and whose duty it is to report it to his superiors, is notice of such defect to the company.

6. SAME—PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE.

The fact that plaintiff was walking diagonally across the street when struck by a falling electric light pole and wires does not tend to establish contributory negligence, in the absence of any facts which would charge her with notice that there was greater danger in so crossing.

7. DAMAGES FOR PERSONAL INJURIES—FUTURE EARNINGS.

An instruction that, if the jury found that plaintiff's injuries would impair her ability to carry on her occupation as school teacher in the future, she was entitled to recover as damages therefor the amount of salary she would have earned during the time she would be so disabled from pursuing her occupation, is erroneous; the true rule being that, upon all the evidence, the jury should award such fair sum as would, in their judgment, compensate for the lessened or destroyed ability to earn money, making due allowance for the contingencies and uncertainties that inhere in such matters. Thayer, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

T. J. O'Donnell (Milton Smith, on brief), for plaintiffs in error.
D. V. Burns, for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge. This action was brought in the circuit court for the district of Colorado by the defendant in error against the city of Denver and the Denver Consolidated Electric Company to recover damages for personal injuries caused her by the falling of an electric light pole to which were attached the wires which supported the lamp used in lighting the city streets. In her petition, the plaintiff, as ground of jurisdiction, averred that she was a citizen of the state of Kansas, and that the defendants were corporations created under the laws of the state of Colorado. In the answers filed, the defendants took issue on the averment of the citizenship of the plaintiff, claiming that she had become a citizen of the state of Colorado. The issue thus made was heard and determined before entering upon the merits of the case, and, upon the conclusion of the evidence adduced on that issue, the court instructed the jury to find thereon in favor of the plaintiff, and this ruling is now assigned as error. The point at issue was: Of what state was the plaintiff a citizen when this action was brought, on the 29th day of October, 1897? The evidence showed without dispute that the plaintiff had been born in Hiawatha, Kan., and had lived there all her life, as a member of her father's family, being engaged as a teacher in the public schools of that place, until, in May, 1897, she went to the city of Denver, for the purpose of endeavoring to secure a position in the schools of that city; and she and her father both testified that, if she failed in securing such position, it was her intent to return to Kansas, and continue her occupation as a teacher in Hiawatha. On the 21st and 22d days of June, she underwent the requisite examination before the school board of Denver; but, before the result was known, she was injured as stated, and, when sufficiently recovered, she returned to her father's house, in Hiawatha; and since that time she had continued to live at Hiawatha as an inmate of his family. The

utmost that could be fairly claimed under the evidence in this case is that it was the purpose of plaintiff to change her place of residence from Hiawatha to Denver in case she was successful in obtaining a position as teacher in the schools of the latter city; but this position was not obtained, and the plaintiff still continues to be a member of her father's family, at Hiawatha. Clearly, therefore, there was not any evidence in the case which would have sustained a finding that on the 29th day of October, 1897, the plaintiff was a citizen of the state of Colorado, and had ceased to be a citizen of Kansas; and, this being true, the court did not err in directing a verdict on this issue in favor of plaintiff, thus sustaining the jurisdiction of the court.

Upon the merits of the case, it appeared from the evidence that the Denver Consolidated Electric Company, under an ordinance of the city of Denver, had obtained the authority to place in the city streets the poles and wires necessary to enable it to furnish electricity for lighting purposes; that, in pursuance of this authority, it had maintained at the intersection of Seventeenth and Stout streets a pole and wires, and also a lamp attached to wires, for the purpose of lighting the street; that on the 22d day of June, 1897, this pole fell down, carrying with it the wires attached thereto, which struck the plaintiff, who was then crossing the street, and severely injured her. The plaintiff further introduced evidence tending to show that the pole had been erected for a number of years; that it had become rotten in the part subjected to the dampness of the earth, which condition could have been readily discovered by proper examination of the pole; and it was claimed on behalf of plaintiff that both defendants had been guilty of negligence in thus allowing the pole to remain in the street after it had become rotten. Both the city and the electric company are joined as defendants to the action, but it will probably aid in a clear understanding of the questions involved if the case is viewed—First, as an action against the city alone, and, second, as one against the electric company.

In defining the legal duty imposed upon the city, the court charged the jury that:

"The city of Denver, as a municipal corporation, is charged with the duty of keeping the streets in a safe condition. If it does anything directly to render them unsafe, it is liable in damages for the act. If it permits another to do anything which renders the streets unsafe, it is liable, and the person doing it will be liable in the same degree. If the city had erected this pole which fell, and the falling of which, it is alleged, caused the injury, and had allowed it to get into a condition which caused it to fall, it would be liable for any injury resulting from such fall; and permitting another, the Consolidated Electric Company, to maintain the pole, in no manner changes the position of the city in the matter."

Exceptions were duly taken to the cited portions of the charge of the court, and we have thus presented the question whether the charge correctly states the duty imposed by the law upon the city with respect to the poles placed in the streets of the city by the electric company. The court instructed the jury that, as the city was charged with the duty of keeping the streets in a safe condition, it was charged with the duty of inspecting the poles from time to time,

in order to ascertain their condition; and, in effect, the court laid down the rule that the city was bound to do all that would have been required of it had the city itself been the owner of the electric plant, including the poles used in connection therewith. If this liability exists with respect to the poles erected in the streets, it must also exist with respect to the wires and lamps attached thereto, for it will be remembered that it is not claimed that the mere erection of the pole which fell created an unlawful obstruction of the streets; but the theory of the trial court was that, as the city permitted the electric company to erect the pole as part of its lighting system, the city was charged with the duty of inspection, by reason of the duty of the city to keep the streets in a safe condition, and therefore, as the city permitted the electric company to string its wires along the streets, and hang its lamps over the same, the same duty of inspection must exist with respect to the wires and lamps as exists with respect to the poles. It is well known that, in the development of urban life, city streets are now used, under legislative sanction, for many purposes other than for the passage of persons, animals, and vehicles along the same. Underneath the streets may be placed conduits for the conveyance of water and gas, while above ground are found telegraph and telephone wires, electric light and power wires, and electric street-car wires, all suspended along and over the streets, and experience has demonstrated that the presence of these wires creates a new danger in the use of the public highways. If what is called "a live wire" becomes broken and falls into the street, it may cause the death of all persons or animals coming into contact therewith. So, also, it has been demonstrated that, in the running of cable cars through the streets of a city, a danger is created to the public, in that occasionally the machinery forming the grip does not properly act, and the car cannot be stopped, but may be dashed into other vehicles, causing injury to persons and property, or the cable itself may become defective, and thus cause an obstruction to the free use of the street. If the ruling of the trial court in this case is sustained, to the effect that, because the city permitted the electric company to erect the pole in the street as part of its electric system, the city became charged with the duty of inspecting the pole, the same as though it was owned and operated by the city, then it must follow that, because a city permits the use of its streets for telegraph, telephone, electric light, and power systems, as well as for the use of cable and electric street-car systems, the city is charged with the duty of inspecting all the poles, wires, lamps, cables, and cars used in connection with these systems in the public streets, in order to prevent obstructions being caused to the safe use of the street, through defects in the appliances used for these several purposes.

The trial court charged the jury that, if the city was liable in this case, it was by reason of its omission in the matter of inspection. But it is apparent that inspection is merely a means to an end, and, if the city was under obligation to inspect, it is because the city was under obligation to maintain the pole in a safe condition; and that this was the meaning of the court in its charge is clear from the statement that:

"If the city had erected this pole which fell, and the falling of which, it is alleged, caused the injury, and had allowed it to get into a condition which caused it to fall, it would be liable for any injury resulting from such fall; and permitting another, the Consolidated Electric Company, to maintain the pole, in no manner changes the position of the city in the matter."

Thus, the jury were instructed that they must view the case just as they would be required to do if it appeared that the city had itself erected the pole as part of a lighting system erected, owned, and operated by the city. Any corporation, municipal or otherwise, or any person that may be the owner of an electric light and power plant, is under obligation to use ordinary care in the maintenance and operation thereof, in order to prevent injury to third parties; but it cannot be true that, simply because a municipal corporation permits another to erect and operate such a plant in the city streets, it becomes charged with the duty of maintaining the poles, wires, and lamps connected therewith in a safe condition. The charge given to the jury was to the effect that the obligation resting upon the city was just the same as though the city had erected and owned the pole; that, therefore, it was under obligation to inspect the pole from time to time, to the end that it should be kept in a safe condition; and that if, through the failure to properly inspect the same, it was allowed to become rotten and fall, the city would be liable for the results thereof. If this is a correct statement of the law, it follows that with respect to all the appliances in the shape of poles, wires, lamps, cables, and the like placed in the city streets, by telegraph, telephone, electric light, electric power, electric and cable street-car companies, there rests a primary duty and obligation upon the city to keep them in safe condition, and to make the inspections necessary to detect defects in order that the same may be promptly repaired. If this duty rests upon the city, then it will be compelled to keep in its employ men who possess the knowledge and skill needed to detect defects, and, when detected, to repair and keep in proper condition the electric wires and the cables and other appliances used in the streets; and it is apparent that this would, of necessity, lead to a conflict, in many instances, between the city and the companies owning and operating the electric and cable plants. In support of the charge of the court upon this point, counsel for the defendants in error cite a number of cases decided by the supreme court of the United States and the supreme court of Colorado, in which the duty of inspecting the streets is recognized; but they are all cases based upon defects in bridges, sidewalks, or carriageways, wherein the primary duty of erecting and maintaining the same, as part of the highway, was upon the city, and wherein the duty of inspection exists, because the duty of keeping in repair rests primarily upon the city; but none of these cases involved the point now under consideration. In this case, the trial court held, and the contrary is not contended for by counsel for defendant in error, that the original erection of the pole was lawful, and did not constitute an obstruction in the street; and therefore the question is narrowed down to the point whether the city is bound to inspect from time to time all poles, wires, lamps, and cables that may be lawfully placed in

the streets, for defects therein, and to repair such defects in order to prevent them becoming an obstruction to the safe use of the streets, or whether the rights of the public are not sufficiently protected by imposing the duty of keeping watch over these appliances upon the corporation or person owning and operating the same, and holding the city liable only in cases wherein, after actual or constructive notice of the existence of danger to the public in the use of the street, growing out of or caused by some defect in the poles, wires, or other appliances, the city does not use diligence in obviating the danger thus created. Believing this to be the extent of liability incurred by the city under such circumstances, it follows that the trial court erred in holding that the same rule must obtain as would be applicable if the city had itself erected the pole for its own purposes.

Coming now to a consideration of the errors relied on as grounds for reversing the judgment against the electric company, the first one presented is that the trial court erred in overruling the motion made by the defendants when the case was called for trial, that the plaintiff be required to elect whether she would proceed against the city of Denver alone, or against the electric company alone, on the ground that the defendants were not joint tort feasors, and were not jointly liable to plaintiff. In form, the complaint charges the defendants with a joint liability. The defendants did not, by motion or demurrer, present the question whether they were properly joined in the action, and in the answers filed no issue or question of this nature was presented. The case coming on for trial, the defendants then moved that plaintiff be required to elect whether she would proceed against the city or the electric company, which was, in effect, asking the court to order separate trials. As the record then was, this was but an appeal to the court to exercise its discretion in determining whether there should be separate trials of the issues presented by the answers. If the motion had been granted, and plaintiff had elected to proceed against the city, the case would still be left pending against the electric company, as the motion did not ask a dismissal of the case as against either defendant. Motions of this character, being but appeals to the discretion of the trial court in regulating the order of trial, do not usually present questions upon which an appeal lies, and this case is not an exception to the general rule.

The principal grounds relied on for a reversal of the judgment against the electric company are found in the charge of the court, touching the duty of the company with respect to the pole erected by it, it being claimed on behalf of plaintiff in error that the court, in effect, made it the duty of the company to exercise such a supervision of the poles forming part of its system that it would certainly detect defects therein rendering the poles unsafe. It will be remembered that negligence against the company was charged in two particulars: First, that the company failed to properly inspect the pole from time to time, and thus it was allowed to become rotten and unsafe; and, second, that, some days before the pole fell, actual notice of the unsafe condition of the pole was brought home to the

company, and, with this notice, the company neglected to make it safe. The portions of the charge to which exceptions were taken are as follows:

"The pole in question was unquestionably a good one when it was erected. It was large enough, and apparently strong enough. If it had broken down immediately, no negligence could be imputed either to the city or to the company on account of the fact. If it had been overthrown by a great storm, as sometimes happens, immediately after its erection, there would be no act of negligence imputable either to the city or the electric light company in respect to it. But it was charged and alleged in the complaint that it was allowed to stand for such time that it became decayed and weak, and that it fell in consequence of such weakness. If this is a fact, and no measures were taken either by the city or the electric light company, to ascertain its condition, or if the measures were not effectual, if they were not such as should have been taken to ascertain the condition of the pole, then the liability exists in the same manner. * * * The defect which existed in it, if there was such defect, being rotten at the surface of the ground or below the ground, was one which was not open to ordinary observation. If there was a shell which was not decayed, it would be necessary to penetrate the shell in order to ascertain the condition of the heart of the pole. Whether any one on behalf of the city or on behalf of the company made any such examination, within a reasonable time, as was needful to ascertain its condition, is a question for your consideration. In putting up the poles in the street, it was undoubtedly a duty resting upon the city, and upon the company which erected them, to examine them from time to time, as often as may be necessary, to ascertain their condition. Decay in timber is natural. We all know what it is. We know it from the ordinary experience of our lives, and it is a circumstance of which all parties concerned in these matters are bound to take notice. They are required to know that timber will decay, and are required to make such examination and inspection from time to time as will determine and ascertain whether decay has taken place to such an extent as to render the timber unfit for use. If you are of opinion that the examinations, either of the electric company or by the city, were of a kind and character such as ought to have been made to ascertain the condition of the pole, and were, in fact, made by them, and that the defect in the pole, if any there was, was not discovered by such examination, then the city cannot be liable in this action. The only liability of the city with respect to the poles erected in this manner, when it was apparently safe on the outside when it was first put up, was to inspect from time to time to ascertain whether it had fallen into a condition which rendered it unsafe."

In the latter part of the charge the jury was instructed that, unless there was negligence on part of the company, it would not be liable; that negligence would consist in a failure to inspect and examine the pole with sufficient care and diligence. And in the first part of the charge it was declared to be the duty of the company to take effectual measures to ascertain the condition of the pole; that the company was required to know that timber will decay, and was required to make such examination and inspection, from time to time, "as will determine and ascertain whether decay has taken place to such an extent as to render the timber unfit for use." It may be true, as is claimed on behalf of the defendant in error, that the court did not intend to impose upon the company a duty beyond that of exercising ordinary care in the maintenance of the poles forming part of its electric light plant; but the question is whether the jury would not naturally construe these instructions to mean that the company was bound to make such an examination and inspection from time to time as would determine and ascertain whether decay had in fact

taken place.    Giving the language used its natural import, it certainly does impose upon the company the duty of making such examination, from time to time, as will ascertain and determine whether the poles have become decayed; and it is then declared that a failure to make such an examination constitutes negligence on part of the company.   The evidence in this case showed that the decay which affected the strength of the pole was not upon the surface, and therefore was not open to ordinary observation, and, applying the instructions given to the facts proven, the jury could only understand from the instructions given that the company was bound to make such an examination of the poles as would be effectual to discover decay existing underneath the surface.

In defining the liability of the city, the court charged the jury that if "the examination, either of the electric company or by the city, were of a kind and character such as ought to have been made to ascertain the condition of the pole, and were in fact made by them, and that the defect in the pole, if any there was, was not discovered by such examination, then the city cannot be liable in this action." No such instruction was given with reference to the electric company, and there seems no escape from the conclusion that the charge was faulty and misleading, in that it failed to properly define the duty resting upon the company with respect to the maintenance of the poles by it lawfully placed in the city streets, in that it was so phrased that the jury must have understood that the company was bound to make such an examination that all defects would certainly be discovered, instead of being bound to use reasonable and ordinary care in the supervision and inspection of the poles placed in the street.    By this ruling it is not meant to relieve the company from a faithful performance of its obligations to the public.    In all cases wherein telegraph, telephone, electric light and power and electric car companies obtain and exercise the privilege of erecting and maintaining poles, wires, lamps, and other appliances in the public streets, they are bound to know that the maintenance of such appliances in and about the highway may create dangers to persons exercising the primary and paramount right of passage along or across the same.    The companies are not insurers of the safety of the public against all dangers arising from the lawful placing in the street of the appliances pertaining to the business carried on by the companies; but they are bound to know the dangers which may naturally be caused by such use of the streets, and to guard against the same by the exercise of all the foresight and caution which can be reasonably expected of prudent men under such circumstances.    If the court, in its instructions, had not overstepped this line in defining the obligation resting upon the electric company, we would not feel compelled to hold that error had been committed; but, as we view it, the court used language which the jury might well construe to mean that practically the company was bound to make such an examination of its appliances as would certainly secure a discovery of all hidden defects therein, which extends the duty resting upon the company beyond the limit which the law imposes upon the company.

It is also assigned as error that the court charged the jury that if Blake, who was an employé of the company, made an examination of the pole, and discovered its rotten and unsafe condition, this would be notice to the company, whether he communicated this knowledge to any officer of the company or not. Blake was called as a witness for the defendant in error, and he testified that he was in the employ of the electric company as a lamp trimmer, it being his duty to trim the lamps, report the "outs," put in carbons, and to report anything that looked bad,—to report any trouble. He further testified that, some 10 or 15 days before the pole fell which injured Miss Sherret, he examined the pole with a screwdriver, and found "that the screwdriver went in pretty easy, and showed that it [the pole] was pretty rotten," and that he was led to make this examination from seeing the pole "wriggling." He further testified that he notified Mr. Sheridan, a storekeeper of the company, of the fact he had discovered. Mr. Sheridan, being called as a witness, denied receiving such report or notice from Blake. Mr. McSparrin, the line foreman of the electric company, and Mr. Barker, the superintendent, both testified that it was Blake's duty to report any defects he discovered either to the foreman or the superintendent, and both witnesses denied receiving any report of the defect in the pole from him. The court instructed the jury that, if they found from the evidence that Blake did in fact examine the pole and discover the unsafe condition thereof at the time he stated in his testimony, this would be notice to the company, regardless of the question whether he made a report thereof to any other employé or officer of the company, and this ruling is assigned as error.

In Thompson on the Law of Corporations (volume 4, § 5195) the rule is stated to be to the effect that, in order to bind the principal, the notice must be communicated to one whose duty it is "to act for the principal upon the subject of the notice, or whose duty it is to communicate the information either to the principal or to the agent whose duty it was to act for him with regard to it." Counsel for the electric company, in the brief submitted, state their view of the rule in the following terms: "The general rule with reference to the question of notice is that notice to the agent is notice to the principal, if the agent comes to a knowledge of the facts while he is acting for the principal; but this rule is limited by the further rules that notice to the agent, to bind the principal, must be within the scope of the employment,"—and cite in support thereof the cases of The Distilled Spirits, 11 Wall. 356, and Rogers v. Palmer, 102 U. S. 263. In the former case it was said that "the general rule that a principal is bound by the knowledge of his agent is based on the principle of law that it is the agent's duty to communicate the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty"; and in the latter case it was held that knowledge obtained by an attorney when conducting a case for a client was imputable to the latter.

As already stated, Blake testified that it was his duty to report anything wrong or any trouble he discovered about the poles or wires of the company; and none of the witnesses for the electric

company deny this fact, but, on the contrary, McSparrin and Barker, the line foreman and superintendent, both testify that it was Blake's duty to report to them any defects he might discover; and thus it was made plain that it was Blake's duty to take notice of defects in the plant coming under his observation, and to report the same when discovered: and therefore, within the doctrine of the authorities cited, the court was justified in instructing the jury that knowledge acquired by Blake of the defective condition of the pole, when he was going his rounds as an employé of the company, would be imputable to the company, because it was proven beyond dispute that it was his duty to take notice of defects, and, noticing them, to make report thereof.

A number of errors are assigned upon the action of the court in permitting testimony to be given with respect to the mental and physical condition of the defendant in error prior to the accident, and her condition after the injury; but we find no error therein, and it is not necessary to discuss them at length.

Exception is also taken to the ruling of the court upon the defense interposed of contributory negligence, which was to the effect that there was no evidence sustaining the defense. The charge of negligence on part of defendant in error was based upon the fact that, when she attempted to cross the street at the time of the accident, she did so diagonally, thus leaving the crossing usually followed by pedestrians; it being claimed that, had she been upon the crossing proper, she would not have been struck by the falling pole and wires. To maintain the defense of contributory negligence under these circumstances, it would be necessary to hold that the defendant in error had no legal right to cross the street diagonally, and that she was a trespasser in thus going upon it. In support of this contention, counsel for plaintiff in error cite a number of cases wherein it was held that it was a question for the jury to determine whether the party injured was negligent in the use made of the street or highway; but these are cases wherein the charge of negligence against the defendant corporation was a failure to keep the sidewalk in proper condition, in that some defect existed in the pathway itself, but it appeared that the usually traveled part of the street was in proper condition, and the injury had been occasioned by the traveler going outside of this part of the street. In this class of cases there is usually a choice given to the traveler to use the usually traveled and safe part of the highway, or to go upon the part which may be less safe; and then it is for the jury to say whether it was negligence to use the latter. In this case, as the trial court stated to the jury, when defendant in error started to cross the street, there was nothing in the surroundings which would charge her with notice that she incurred greater danger in crossing diagonally, and therefore there was nothing on which to base the charge of contributory negligence other than the fact that she crossed diagonally; and certainly this would not sustain the charge of contributory negligence, unless it be true that pedestrians have no right to cross a public street except at right angles and at places ordinarily used as a crossing. The use of the public streets between crossings is not limited solely to

animals and vehicles, but may be used by footmen, due caution being exercised. Elliott, Roads & S. 622; Moebus v. Herrmann, 108 N. Y. 349, 15 N. E. 415.

The only other error assigned which needs consideration is based upon that part of the charge upon the rule of damages which was given in the following words:

"If she is under further disability, if these injuries are permanent in their character, so that she will not be able hereafter to resume her occupation, or, resuming it, cannot perform the service as efficiently as before, she is entitled to compensation in the degree in which she loses the power to earn money. So that, if you think that her powers are permanently impaired, that she will not hereafter be able to carry on her occupation as a school teacher, for the length of time for which she is withdrawn from her occupation she is entitled to such money as she could earn during that time, whether it be one year or more."

In effect, the jury were instructed that defendant in error was entitled to compensation for the past loss of time, resulting from the injury,—that is, to the compensation she would have earned as a school teacher; and, further, that, if the jury found that the injuries received would impair her ability to carry on her occupation as a school teacher in the future, she would be entitled to the salary she would have earned for the year or years she was disabled from pursuing her occupation. In cases wherein the evidence shows that the injury received will affect the ability of the party in the future to earn money, compensation must be made therefor; but the rule is not that the jury must determine the number of years that the disability will continue to exist, and then multiply this number by the yearly compensation the party has earned in the past. Damages for future losses in cases of this kind are not susceptible of computation by a strictly mathematical calculation. Evidence may be given of the age of the party injured, the probable duration of life, the effect the injury has had upon the ability of the person to earn money, of the probability that the injurious effect on the ability to earn money will continue in the future, either during life or for a lesser period, and of the business or occupation in which the person was engaged, and the compensation, whether by wages, fees, by a fixed salary or profits that resulted therefrom; and, from the facts thus proven in evidence, it is for the jury to award such fair sum as will, in their judgment, compensate the party for the decreased or destroyed ability to earn money in the future, due allowance being made for the contingencies and uncertainties that inhere in such matters. Railroad Co. v. Putnam, 118 U. S. 545, 7 Sup. Ct. 1; Railway Co. v. Needham, 10 U. S. App. 339, 351, 3 C. C. A. 129, 148, and 52 Fed. 371, 378. We are of the opinion that the charge of the court on this subject is open to the criticism that the jury would naturally infer therefrom that they must compensate the defendant in error for this future loss by allowing her the yearly compensation she had earned as a teacher for the length of time they deemed the disability would continue, thus assuming that, if this accident had not happened, the defendant in error would certainly have continued to teach at that rate of salary for her lifetime, or for the length of time the jury determined the injury would continue to affect her

ability to earn money; and, as already said, this is not a correct statement of the rule to be observed by the jury in estimating damages of this nature.

For these reasons, the judgments rendered must be reversed, and the case be remanded for a new trial as to both the city of Denver and the electric company.

THAYER, Circuit Judge (dissenting). I am not able to concur in all the propositions considered and decided in the foregoing opinion. If a city authorizes a telegraph, telephone, or electric light company to erect a tall wooden pole, burdened with wires, on one of its public thoroughfares, it is affected with knowledge, from the very nature of the structure, that, in course of time, it will decay, and become dangerous to those who have occasion to use its streets. I am of opinion, therefore, that a municipality which authorizes such poles to be erected on its streets is under an obligation to the public to see that they are examined in a proper manner and at reasonable intervals, either by its own agents or by the persons or corporations whom it has authorized to erect them, and that the duty of inspection does not rest exclusively upon the latter, as the opinion of the majority seems to hold. Moreover, I do not understand that the charge of the trial judge, when considered altogether, imposed upon the electric light company the duty of exercising more than ordinary care in the matter of inspecting its poles. From the fact that the jury were instructed very pointedly that there could be no recovery against either of the defendants unless negligence on their part was proven, it is apparent, I think, that the trial judge did not entertain the view, or intend to convey the idea to the jury that the electric light company was bound at all hazards to see that its poles were in a safe condition. Considered as an entirety, the charge on this branch of the case meant, I think, that the electric light company was required to adopt a proper method of examining its poles, —one which would be liable to develop any interior rottenness,— and to examine them at reasonable intervals. This direction, in my judgment, was substantially correct.