## CITY OF SHAWNEE v. SEARS.

No. 1239.    Opinion Filed November 25, 1913.

(137 Pac. 107.)

1. MUNICIPAL CORPORATIONS—Streets—Defective Electric Wiring—Liability for Personal Injuries. A municipal corporation is liable for an injury caused by a dangerous obstruction in the street which results from a disarranged or defective system of electrical wiring, maintained lawfully in the streets by others than the municipal corporation itself, only where it had, or by the exercise of reasonable care would have obtained, notice of the particular defective and dangerous condition which produced the injury, with reasonable opportunity to remedy the dangerous condition before the injury occurred.

2. SAME—Duty to Inspect—Personal Injuries. A municipal corporation is not required to inspect the wiring, insulation, appa-

ratus, and appliances of an electric light plant, operating in the city under a franchise, to discover defects therein. If, however, a municipality permits a third party to maintain in the streets a system of electrical wiring, a portion of which extends into a sidewalk, constituting an obstruction thereof, and which creates a condition so inherently dangerous as to amount to a nuisance—one that constitutes a peril and menace to persons using the streets—and it has knowledge of such condition, and of the danger, or the· circumstances are such that knowledge will be implied, then it may be liable to a person injured because of such dangerous obstruction.

(Syllabus by Brewer, C.)

*Error from District Court, Pottawatomie County; W. N. Maben, Judge.*

Action by May Sears against the City of Shawnee, a municipal corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

*P. O. Cassidy* and *W. M. Engart,* for plaintiff in error.

*Stanard, Wahl & Ennis* and *J. H. Woods,* for defendant in error.

Opinion by BREWER, C. May Sears, about 6 a. m., May 1, 1904, who was at the time about twelve years of age, slipped and fell against a guy rod erected and maintained by the Shawnee Light & Power Company, a corporation, and was severely burned by reason of the rod having become charged the night preceding with electricity. She sued and recovered a judgment against the light company, which on appeal was sustained by this court. 21 Okla. 13, 95 Pac. 449. The light company became insolvent, and the judgment could not be collected, and this present suit was brought against the city of Shawnee, and the Shawnee Telephone Company, which appears to have been also using the poles of the light company for some of its wires. At the trial the plaintiff abandoned her claim against the telephone company, and proceeded to recover a judgment against the city of Shawnee, which brings error, and alleges that the evidence is insufficient to support the verdict and judgment against it.

The suit of plaintiff is shown by the pleading to have proceeded upon two theories, upon either of which it was contended that the city was liable. The first was, briefly stated, that the city, because of its having granted the franchise under which the light company erected and was operating its plant, and because of its general power of supervision over same, etc., under the law, was charged with the duty of seeing that the light company constructed and maintained its plant, wires, appliances, and instrumentalities at all times in a safe condition; that its obligation, in other words, to the public, of vigilant care and constant inspection of these instrumentalities, was the same as those of the light company owning and operating the plant. The second theory was that the city had constructive notice of the deranged condition of the electrical appliances; that is, that the dangerous condition existed sufficiently long that the city, in the proper discharge of its duty to keep the public ways reasonably safe, ought to have discovered and remedied same in time to have prevented the accident. At the trial the court eliminated the first theory upon which plaintiff sought to charge the city, in the instructions to the jury, by holding that the city was not charged with the duy of inspection of the appliances of the light company, and that before a recovery could be justified it must be shown by the evidence that the city had actual notice of the deranged and dangerous condition of the wires, in time to have prevented the injury, or that the defect existed sufficiently long and under such circumstances that it ought to have discovered the same in time to prevent the injury, and therefore it might be liable, under the doctrine of implied or constructive notice. The rule in this, and perhaps a majority of the states, and in the Supreme Court of the United States, relative to the liability of a municipality for defects in the streets, sidewalks, etc., which it constructs and is under the primary duty to maintain, is not involved here, except in a general way; nor is the rule announced here applicable where the municipality owns, constructs, and maintains a lighting plant.

The precise questions presented here have not arisen as often as one would suppose; and upon an examination of the cases cited, and others we have been able to find, we have concluded that the view of the trial court as to the liability of a municipal corporation under the circumstances of this case is substantially correct. We do not believe that the city which authorizes a public utility such as an electric light plant, street car, or telephone system, to make use of the streets in a lawful way, is held to the same degree of care, and the duty of inspection, in regard to the construction and maintenance of the equipment and appliances of such a utility, as is the company itself. We think the correct rule is that the municipality is liable for an injury caused by a dangerous obstruction in the street which results from a disarranged or defective system of electrical wiring, maintained in the streets by others than the municipality itself, only where it had, or by the exercise of reasonable care might have had, notice of the particular defective condition which produced the injury. In Joyce on Electrical Law, vol. 1, sec. 243, it is said:

"Although a city has merely authorized the erection and operation of an electric plant in its streets, and does not own it, said city is not bound to inspect, from time to time, all poles, wires, lamps, and cables, for defects therein, and to repair such defects in order to prevent their obstructing the safe use of the streets. Nor is it liable, except upon actual or constructive notice of the existence of danger, to the public in the use of the street, by reason of some defect in said poles, wires, etc., and its failure to use diligence in obviating the danger."

It is true that the courts are not in harmony on these questions. Pennsylvania seems to hold the city liable under whatever circumstances would render the electrical company liable, thus holding the city to the duty of inspection. *Mooney v. Luzerne,* 186 Pa. 161, 40 Atl. 311, 40 L. R. A. 811; *McKeesport v. McKeesport & R. P. R. Co.,* 2 Pa. Super. Ct. 242. On the contrary, New York, some of the federal courts, and other states have held that the municipality is not charged with the duty of inspection. *Fox v. Manchester,* 183 N. Y. 141, 75 N. E. 1116, 2 L. R. A. (N. S.) 474, is a leading case. In that case it is said in the head notes:

"A municipality is not responsible for injuries to travelers arising from fallen or hanging telephone or electric light wires obstructing the street and likely to strike or come in contact with them, unless it has notice of such obstruction or the condition is apparent and the danger obvious."

And in the body of the opinion, it is said:

"It is contended that the fact that persons had received shocks from the telephone wire at this point should have apprised the trustees that the telephone wire and the light wires must at some point to the south have been in contact, and therefore dangerous, and that the trustees should thereupon have inspected the two lines and either had the telephone line removed or the position of the wires changed. This view was substantially accepted by the trial court, which charged, over the exception of the defendant village, that the law imposed on the officials of the municipality the duty of making an inspection from time to time to see whether the wires, if dangerous, had been remedied or removed. We are of a different opinion. Nobody had received substantial injury by the hanging wire at the bakery. The children had played with it and thus received the shocks. It is true one man is said to have been knocked down, but it appears that he was intoxicated at the time. The trustees discharged their duty when they cut off and removed the pendent wire. There was nothing so alarming in the fact that children playing with the wire had received shocks from it, in no case with serious results, that rendered it necessary or the duty of the trustees to inspect the whole length of the wires to examine their insulation and see that at all points they were in proper condition. Though the law authorizes the construction of electric light lines, power lines, telephone lines, and similar structures along the streets and highways, that does not relieve the municipality from its duty to see that the streets and highways are kept reasonably safe and secure for the public using them. But this doctrine is not to be carried to the extent of holding that the obligation of the municipality is coextensive with that of the company which maintains the line. Principally the duty of a municipality is to see that its streets and highways are kept safe and secure for passage over the surface, for the primary object of highways is to enable the public to travel thereon. Therefore it must always be alert to prevent or guard obstructions in the highways. Where, however, the danger to the traveler is not in the nature of an obstruction, but proceeds from the negligence of a third party in the use of the highway in a manner authorized by law, the mu-

nicipality should not be held liable for that negligence unless it has notice thereof, or the condition is apparent and the danger obvious. The municipality may well be held to the same degree of responsibility with regard to electric light poles, telegraph poles, and the like that is imposed upon it with reference to awnings, gratings, and similar incumbrances on the street, and so also as to fallen or hanging wires obstructing the street and likely to strike or come in contact with the traveler. To go further, however, and impose upon a municipality the duty of inspecting the insulation of the wires, the position in which they are strung, and similar matters involving technical knowledge, unless in the case of an obvious danger or exceptional occurrence, would place upon it a very onerous and unfair burden. The company maintaining the line of wire is primarily liable for its negligent or defective condition in these respects and should be solely so unless in the cases suggested of obvious danger or exceptional circumstance."

And in the course of the opinion in *City of Denver v. Sherret,* decided by the Eighth Circuit Court of Appeals, 88 Fed. 226, 31 C. C. A. 499, it is said:

"The court instructed the jury that, as the city was charged with the duty of keeping the streets in a safe condition, it was charged with the duty of inspecting the poles from time to time, in order to ascertain their condition; and, in effect, the court laid down the rule that the city was bound to do all that would have been required of it had the city itself been the owner of the electric plant, including the poles used in connection therewith. If this liability exists with respect to the poles erected in the streets, it must also exist with respect to the wires and lamps attached thereto, for it will be remembered that it is not claimed that the mere erection of the pole which fell created an unlawful obstruction of the streets; but the theory of the trial court was that, as the city permitted the electric company to erect the pole as part of its lighting system, the city was charged with the duty of inspection, by reason of the duty of the city to keep the streets in a safe condition, and therefore, as the city permitted the electric company to string its wires along the streets, and hang its lamps over the same, the same duty of inspection must exist with respect to the wires and lamps as exists with respect to the poles. It is well known that, in the development of urban life, city streets are now used, under legislative sanction, for many purposes other than for the passage of persons, animals, and vehicles along the same. Under-

neath the streets may be placed conduits for the conveyance of water and gas, while above ground are found telegraph and telephone wires, electric light and power wires, and electric street car ·wires, all suspended along and over the streets, and experience has demonstrated that the presence of these wires creates a new danger in the use of the public highways. If what is called 'a live wire' becomes broken and falls into the street, it may cause the death of all persons or animals coming into contact therewith. So, also, it has been demonstrated that, in the running of cable cars through the streets of a city, a danger is created to the public, in that occasionally the machinery forming the grip does not properly act, and the car cannot be stopped, but may be dashed into other vehicles, causing injury to persons and property, or the cable itself may become defective, and thus cause an obstruction to the free use of the street. If the ruling of the trial court in this case is sustained, to the effect that, because the city permitted the electric company to erect the pole in the street as part of its electric system, the city became charged with the duty of inspecting the pole, the same as though it was owned and operated by the city, then it must follow that, because a city permits the use of its streets for telegraph, telephone, electric light, and power systems, as well as for the use of cable and electric street car systems, the city is charged with the duty of inspecting all the poles, wires, lamps, cables, and cars used in connection with these systems in the public streets, in order to prevent obstructions being caused to the safe use of the street, through defects in the appliances used for these several purposes.

"The trial court charged the jury, that if the city was liable in this case, it was by reason of its omission in the matter of inspection. But it is apparent that inspection is merely a means to an end, and, if the city was under obligation to inspect, it is because the city was under obligation to maintain the pole in a safe condition; and that this was the meaning of the court in its charge is clear from the statement (to the jury). Thus, the jury were instructed that they must view the case just as they would be required to do if it appeared that the city had itself erected the pole as part of a lighting system erected, owned, and operated by the city. Any corporation, municipal or otherwise, or any person that may be the owner of an electric light and power plant, is under obligation to use ordinary care in the maintenance and operation thereof, in order to prevent injury to third parties; but it cannot be true that, simply because a municipal corporation permits another to erect

and operate such a plant in the city streets, it becomes charged with the duty of maintaining the poles, wires, and lamps connected therewith in a safe condition. The charge given to the jury was to the effect that the obligation resting upon the city was just the same as though the city had erected and owned the pole; that therefore it was under obligation to inspect the pole from time to time, to the end that it should be kept in a safe condition; and that if, through the failure to properly inspect the same, it was allowed to become rotten and fall, the city would be liable for the results thereof. If this is a correct statement of the law, it follows that with respect to all the appliances in the shape of poles, wires, lamps, cables, and the like placed in the city streets by telegraph, telephone, electric light, electric power, electric and cable street car companies there rests a primary duty and obligation upon the city to keep them in a safe condition, and to make the inspections necessary to detect defects in order that the same may be promptly repaired. If this duty rests upon the city, then it will be compelled to keep in its employ men who possess the knowledge and skill needed to detect defects, and, when detected, to repair and keep in proper condition the electric wires and the cables and other appliances used in the streets; and it is apparent that this would, of necessity, lead to a conflict, in many instances, between the city and the companies owning and operating the electric and cable plants. In support of the charge of the court upon this point, counsel for the defendants in error cite a number of cases decided by the Supreme Court of the United States and the Supreme Court of Colorado, in which the duty of inspecting the streets is recognized; but they are all cases based upon defects in bridges, sidewalks, or carriageways, wherein the primary duty of erecting and maintaining the same, as part of the highway, was upon the city, and wherein the duty of inspection exists, because the duty of keeping in repair rests primarily upon the city, but none of these cases involved the point now under consideration."

That to hold the municipality liable it must have had notice actual or implied is held in the case of *Decatur v. Hamilton,* 89 Ill. App. 561. See note 2 L. R. A. (N. S.) 476, in which it is said:

"While we are not prepared to hold, as has been held in some of the states, that a city is liable for injuries resulting from a defect in the construction of an electric car line or for an improper adjustment of electric wire suspended over the street,

we do hold, as a matter of law, that where a private corporation, to whom has been granted the right to operate by electricity a street railway, uses an appliance that is a constant menace to the public in the use of the street, and the city has notice of the same, but neglects to abate it, the city is liable," etc.

See, also, *West Kentucky Telephone Co. v. Pharis*, 78 S. W. 917, 25 Ky. Law Rep. 1838; *Colbourn v. Wilington*, 4 Pennewill (Del) 443, 56 Atl. 605; *Hayes v. Hyde Park*, 153 Mass. 514, 27 N. E. 522, 12 L. R. A. 249; *District of Columbia v. Dempsey*, 13 App. D. C. 533; *Kansas City v. Gilbert*, 65 Kan. 469, 70 Pac. 350.

As said in *Fox v. Manchester, supra,* the municipality is not relieved of the duty to see that the streets and highways are kept reasonably safe and secure for the public using them. This duty, however, falls far short of that imposed on the company which maintains the lines. And where the danger to the traveler is from an obstruction on the street, primarily caused by the negligence of a third party, the municipality will not be held liable for that negligence unless it had notice thereof, or the condition was apparent, and the danger clearly obvious.

The evidence shows that at the time of this injury the various guy wires used in the construction were without any kind of insulation. Where the injury occurred at Tenth street and Oklahoma avenue, an arc light was suspended over the center of the street intersection. This lamp was hung on an iron wire extending diagonally from the top of the pole at the southeast corner to the top of the pole at the northwest corner; each end being fastened to the pole by metallic bolts. This wire is called a suspension guy. Another wire attached to the lamp was used to raise and lower the lamp, and, when not in use, was fastened to one of the poles. This wire is called a supporting guy. At the northwest corner, there was an iron wire fastened near the top of the pole, about twelve inches below the end of the suspension wire, which ran into the ground and was fastened to a heavy buried timber. This wire was called a guy and was to support the pole in an upright position. All of these guy wires, the suspension guy, the supporting guy, and the pole guy wire, were supposed to be at all times "dead" wires,

that is, wires that never carried electricity, but none of them had any insulation, or devices for breaking the current in case it should get into them from the other wires carrying the current. This was the manner of the original construction of this system several years before the injury, and in which the city was permitting it to be maintained at the time of the injury. The night preceding the injury was very stormy and a heavy rain fell. During the night the top of these poles at this street intersection were seen to be afire. Next morning early the plaintiff below, a little girl probably twelve years old, started down the pathway along the parking of the street; there being no sidewalks. She was discovered in a few minutes lying on the ground where this pole guy entered it, horribly and frightfully burned by having come into contact with the guy. So much electricity was escaping through this guy wire that blue blazes were coming up out of the wet ground where the child lay. A witness who was on the scene next day, and who was familiar with electrical construction, testified that the primary wire, the one carrying the electric current used for residences, was lying against the supporting guy; that it charged and followed this guy to the suspension guy, and followed it to the pole on the northwest corner into and through the twelve inches of wet wood to the pole guy and down it into the ground.

It is clearly inferable: That this uninsulated construction was general all over the city. There was proof, tending to show that a device known as the "strain insulator," had been in general use for a number of years. This is a round piece of nonconducting material which is set into these "dead" guy wires, and, when through any cause a current gets into one of these "dead" wires, it follows to this insulator, which, being a nonconductor, stops or breaks the current so it cannot escape to where persons can come into contact with it. That there were also other methods of protecting against coming into contact with this current. That insulation or protection was, and had been for years prior to the injury, recognized generally as necessary, and was being provided generally for the protection of

the people.   Considerable time was devoted to evidence along this line, and much of it is conflicting.

The evidence shows that all of the guy wires ought to have had an insulator, and it is most probable that if either one of them had been so equipped the injury would not have happened. If the condition detailed above was so inherently dangerous as to amount to a nuisance—constituting an ever present peril and menace to persons using the street—and the city had knowledge of the same, or if the dangers inhering in the condition were so apparent and obvious, and of such long standing, as to impute notice to the city, then it neglected its duty to the public in permitting the dangerous condition to be maintained.

From an examinaion of the evidence we have concluded that there was some evidence tending to show a negligent failure of the city to perform its duty and that the court fairly submitted this question to the jury.   In fact, the instructions of the court limited the grounds of recovery further than was warranted by the views herein expressed; but this, of course, cannot be said to militate against the defendant.

The cause should be affirmed.

By the Court:  It is so ordered.