[Civ. No. 3052.   Third Appellate District.—February 19, 1926.]

JAY L. ROCCA, Administrator, etc., Respondent, v. TUOLUMNE COUNTY ELECTRIC POWER AND LIGHT COMPANY (a Corporation), Appellant.

[1]   NEGLIGENCE — ELECTRIC POWER LINES — DANGER FROM FALLING LIMBS—PROTECTION OF PUBLIC.—An electric power company maintaining high-tension wires along a public highway is not relieved from the duty of protecting said wires from a limb from a pine tree standing on private property, if the fall of such limb is likely to endanger persons passing along said highway, but said company must protect its wires and take the ordinary precautions which the circumstances demand.

[2]   ID.—INJURIES CAUSED BY STORM—DUTY TO ANTICIPATE.—An electric power company maintaining high-tension wires along a public highway is not relieved from liability for injuries to a person coming in contact with wires caused to sag during a storm, unless it is one which could not reasonably have been anticipated.

---

1.   Liability of one maintaining electric wire over or near highway for injury where wire is broken by the fall of a tree or limb, note, 19 A. L. R. 801.

2.   See 10 Cal. Jur. 194.

[3] ID.—INSUFFICIENT POLES—LOOSELY HUNG WIRES—DANGER TO PUB-
LIC.—In this action for damages for the death of plaintiff's in-
testate through coming in contact with a high-tension wire of
defendant power company which had been caused to sag to within
three feet of the ground by a limb from a near-by tree which was
broken during a storm, the failure of the defendant electric power
company to erect an additional pole to the south of the intersecting
road along which the decedent was traveling, which would have
protected the public in the use of said road from an accident
such as happened to the decedent, and the fact that the spans
between the poles were of such great distance and the wire so
loosely hung that it could be pressed to the ground within about
twenty feet of one of the supporting poles without breaking, were
matters of fact going to the question of defendant's negligence
proper for the jury to consider.

[4] ID.—INJURY TO USER OF HIGHWAY—PRESUMPTION OF NEGLIGENCE.
The fact that a person, while traveling along a public highway,
was injured by coming in contact with a highly charged electric
wire belonging to an electric light and power company, which was
sagging down across the public highway where the accident oc-
curred, raises a presumption of negligence on the part of the
company maintaining the wire.

[5] ID.—DUTY TO ANTICIPATE ACCIDENT—ABSENCE OF PREVIOUS BREAK-
ING.—The accident having been such as defendant light and power
company should reasonably have anticipated and guarded against,
the fact that no previous breaking of a limb from the tree in
question was shown was wholly immaterial.

[6] ID.—RES IPSA LOQUITOR—NONSUIT—EVIDENCE.—In this action for
damages for the death of plaintiff's intestate through coming in
contact with a high-tension wire of defendant power company
which had been caused to sag to within three feet of the ground
by a limb from a near-by tree which was broken during a storm,
the doctrine of *res ipsa loquitor* was applicable, the denial of de-
fendant's motion for a nonsuit was proper, and the question of
negligence on the part of defendant in not properly maintaining
its wires and guarding the same against dangers reasonably to be
apprehended was one properly to be submitted to the jury.

[7] ID.—LIABILITY OF DEFENDANT—SURROUNDING CONDITIONS—INSTRUC-
TIONS.—In such action, any error or ambiguity in the instruction
that the defendant would be liable in damages to the plaintiff
if "the defendant so constructed and maintained its electric pole
lines and power wires that a pine tree was permitted to be and
remain sufficiently near said power line that a limb from said tree

4.  See 10 Cal. Jur. 199; 9 R. C. L. 1221.
5.  See 19 Cal. Jur. 563; 22 R. C. L. 125.

extended over and above said power wires of said defendant, and that said limb under weather conditions that were not unusual for said season of the year in that locality, fell upon the electric power line of said defendant and placed said line sufficiently near the ground as to cause said power line at the point where the same crossed the . . . road to reach a point sufficiently near the ground that the deceased . . . in walking along said road without negligence or fault upon his part, walked against or came in contact with said wire, and as a result thereof was killed, and that the killing of said deceased was due to the negligence of said defendant in the manner and place of the construction and maintenance of its electric power lines, when considered with reference to said tree and overhanging limb," did not constitute reversible error, in view of the succeeding instructions which fully presented to the jury all questions of negligence on the part of the defendant, the dangers to be apprehended and the conditions surrounding the maintenance of the wire and whether the storm was a usual one occurring in that locality, or was of unprecedented violence and of a degree and force not to be reasonably apprehended.

[8] ID.—EXCESSIVE VERDICT—EVIDENCE.—In this action for damages prosecuted under the provisions of section 377 of the Code of Civil Procedure, in the interest of the mother of plaintiff's intestate, in view of the evidence showing that the mother and the deceased were living together upon the mother's ranch, that the mother was dependent upon the deceased for his management, control, and operation of her ranch properties, as well as enjoying his society, comfort, and protection, that the pecuniary value of the deceased to his mother in the management of her properties was the sum of twelve hundred dollars per year and that her life expectancy was ten years, it could not be said that the jury's verdict of twelve thousand dollars was excessive.

[9] ID.—EXCESSIVE DAMAGES—APPEAL.—An appellate court is entitled to interfere and set aside a verdict of a jury, on the ground of the damages allowed being excessive, only when it appears that improper causes have led to the verdict.

---

(1) 20 **C. J.**, p. 349, n. 32 New. · (2) 20 **C. J.**, p. 357, n. 11 New. (3) 20 **C. J.**, p. 390, n. 75.   (4) 20 **C. J.**, p. 382, n. 24, p. 390, n. 75. (5) 20 **C. J.**, p. 345, n. 3.   (6) 20 **C. J.**, p. 390, n. 75.   (7) 4 **C. J.**, p. 1029, n. 30; 38 Cyc., p. 1778, n. 73, p. 1779, n. 74, 75, 76, p. 1784, n. 84, 85.   (8) 17 **C. J.**, p. 1350, n. 7.   (9) 4 **C. J.**, p. 872, n. 19.

APPEAL from a judgment of the Superior Court of Tuolumne County. J. A. Smith, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. B. Curtin for Appellant.

Jacobs & Jacobs for Respondent.

PLUMMER, J.—The plaintiff, as the administrator of Lige William Rocca, deceased, prosecutes this action under the provisions of section 377 of the Code of Civil Procedure, in the interest of Marguerite Rocca, mother of the deceased. Plaintiff had judgment in the sum of $12,000. A motion for a new trial being denied, defendant appeals to this court from said judgment.

After setting forth some preliminary matters, the complaint alleges that the defendant is a corporation organized for furnishing electricity for lighting and power purposes and was maintaining a line of wires, poles, etc., for carrying and conveying electricity from Jamestown to Quartz Mountain and thence to Stent, in the county of Tuolumne, and was so doing on the thirtieth day of January, 1922. It is further alleged that said company maintained an electric power line along a public highway at a point where a certain other road used by the public intersected or connected with said public highway; that said road so intersecting said public highway is known as and called the App Mine road; that said App Mine road was at the time in question and for many years prior thereto had been generally used and traveled by the public. The complaint then sets forth that on or about the thirtieth day of January, 1922, and while the defendant was in the possession and control of said electrical power line, it was so negligent and careless in maintaining and using the same that said wire was allowed to sag to within about three feet of the ground where it passed over the App Mine road; that on the morning of the 30th of January, 1922, the deceased, while walking along said App Mine road, came in contact with said wire without any negligence on his part and was immediately electrocuted. Damages are then alleged in the sum of $15,000.

The answer of the defendant admits the maintenance of the power line, the death of the deceased as caused by coming in contact therewith, and then alleges that during the night of January 29 and 30, 1922, an unusual storm prevailed over the country where the power line of the defendant was maintained and that, owing to the unusual severity of the

storm, a limb was broken from a tree standing near the said power line; that said limb fell upon one of the wires maintained by the company and thereby caused the same to sag within a few feet of the ground as herein stated. The answer further alleges that the deceased was negligent by passing along said road at an early and unseasonable hour, and further that the defendant did not know, and had no means of knowing, that said limb had by reason of the storm been blown from said trees on to the wires belonging to the defendant.

The testimony set forth in the transcript shows that the deceased and another person had passed along said App Mine road on the evening of January 29, 1922; that at the junction of the App Mine road the deceased and a friend named Hawke had alighted from an automobile in which they were traveling and had gone by way of the App Mine road to visit a family by the name of Stephens; that said Hawke remained at the Stephens home until about 2 o'clock A. M., when he left and passed down the App Mine road to the public highway with which said road connects; that the deceased remained at the Stephens home until between 4 and 5 o'clock in the morning, when he left said home and started down the App Mine road to meet his brother, at a point where the App Mine road intersects the public highway. It appears that the deceased and a brother of the deceased had made a previous appointment to meet at the point indicated at about the hour of 5 o'clock on the morning of January 30, 1922. When the brother reached the appointed place on the morning of January 30, 1922, he found the deceased lying dead under the power wire herein referred to; that the power wire was about three feet above the body of the deceased, the wire being held down by the limb of the tree hereinbefore referred to, which limb was resting upon the wire near one of the poles on which the wire was strung and at a point where the limb of the tree rested upon the wire, the wire was pressed down to within about six inches of the ground.

The county road to which we have referred runs from Sonora by Jamestown, thence to the villages of Quartz and Stent. The App Mine road connecting therewith has been traveled by the public for a period of some forty years. The defendant maintained two power wires along the county

road over and above the point where the App Mine road connects therewith. These wires were strung over the App Mine road on poles 245.5 feet apart. These wires ran along the west side of the county road at a distance therefrom where they cross over the App Mine road of about 17 feet. The nearest pole southerly from the App Mine road was distant 94 feet. The nearest pole to the north of the App Mine road was distant about 151 feet. It appears from the testimony also that a telephone company maintained its wires along a line drawn between the power lines maintained by the defendant over the App Mine road and the trees from which the limb was broken, as heretofore stated. The wires of the power line were higher than the telephone wires by some four feet; the power line wires at the pole immediately south of the App Mine road called pole "B" were carried to a height of some 30 feet; at pole "C" to the north the wires were at an elevation of only 22 feet. It also appears from the testimony that the Pacific Gas and Electric Company maintained electric power lines over the App Mine road a short distance away and that the poles of the Pacific Gas and Electric Company where its lines were carried over the App Mine road were 108 feet apart. It also appears that old stumps of poles formerly used by the defendant in maintaining its line indicated that the span over the App Mine road was at one time only 148 feet. It further appears from the testimony that during all of the period of time the defendant has maintained its electric power lines herein referred to, a certain pine tree stood 33 feet distant from the power lines belonging to the defendant and a short distance northerly from the pole "B" carrying the power wires over the App Mine road. In other words, the tree was between the poles carrying the span of wires over the App Mine road. It further appears that this tree which was to the west of the power lines leaned toward the east, so that a line dropped from where the limb was broken from the tree would reach the ground a trifle over eight feet nearer the power line than the base of the tree. At a point from 45 to 48 feet above the ground a limb 10 or 12 inches in diameter where it joined the tree extended out in an easterly direction, at an angle of about 45 degrees. This limb was from 35 to 40 feet in length and overhung the power lines belonging to the defendant, but was some distance above the power line. The

pole of the power line near the pine tree is called in the
testimony "pole B"; the next pole to the south thereof is
called "pole A" and was distant from pole B 257 feet; the
pole to the north of the App Mine road is called in the
testimony "pole C," and, as hereinbefore stated, is distant
from pole B 245½ feet; the next pole of the power line north
of pole C is called in the testimony "pole D," and is distant
from pole C 260 feet; the next pole north of pole D is called
"pole E," and is distant from pole D 199½ feet. The power
wires of the Pacific Gas and Electric Company over the same
corresponding territory, but on the opposite side of the
pine tree, have the following spans: 113 feet, 95½ feet,
162½ feet and 98 feet. The two wires maintained by the
defendant were strung on crossarms and tied to insulators
thereon about four feet apart. The wires of the defendant
power company were three or four feet higher than the
highest wire of the telephone company. The branches of
the limb of the tree caught the east wire of the defendant
company and pressed it to the ground as hereinbefore stated,
leaving the butt end of the limb resting upon the west wire
maintained by the power company and drawing it down
to within some 12 or 14 feet of the ground. The pine tree
is 27 inches in diameter and some 83 feet in height. The
ground upon which the pine tree stood was elevated a slight
distance above the ground where pole B was located. The
point where the limb broken from the tree pressed the east
wire of the power line to the ground was about 19½ feet
north of pole B. All the testimony shows that the night in
question was very dark. On the part of the appellant, con-
siderable testimony was introduced to the effect that it was an
unprecedentedly stormy and windy night. On the part of
the plaintiff, considerable testimony was introduced to the
effect that, although it was a stormy night, the storm was
not unusual in its violence, and was only such a storm as
frequently occurs in the mountainous regions where the
power lines were maintained. In this particular, the appel-
lant claims that the death of the deceased was brought about
by inevitable casualty and was the result of causes not to be
reasonably apprehended or reasonably guarded against. The
testimony shows that the scar on the pine tree where the
limb was broken away showed an old break of about one-
third of the surface thereof on the upper portion and a clean

fresh break on the remainder. The testimony in the transcript shows that employees of the company knew of the circumstances of the pine tree and limb in question, but there is no evidence in the transcript indicating whether the old crack in the limb where it joined the parent tree was visible from the ground, or could have been discovered by an inspection of the limb, nor is there any evidence in the testimony that any inspection or examination was ever made of the tree prior to the accident in question by anyone connected with the company or otherwise.

The testimony further shows that the deceased was unmarried and about 29 years of age; that the deceased and his mother lived on a ranch near Algerine, in the county of Tuolumne; that this ranch comprised some 600 acres in area; that the deceased had lived upon the ranch with his parents for a number of years preceding the World War; that during the World War the deceased was in the army and away from home; that upon his return in 1919 he worked for awhile in a bakery near Sonora; that in November, 1920, the deceased returned to the ranch and remained there until the date of his death; that in July, 1921, the father of the deceased died, and after the death of the father of the deceased, the deceased, for about 14 months and up to the date of his death, took charge of the ranch; that the deceased was familiar with farming operations and looked after the ranch in an excellent manner; that during the 14 months the deceased was in charge of the ranch in question the mother of the deceased depended exclusively upon him for the management of her affairs; that during the time the deceased was in charge of the ranch the proceeds thereof were deposited in a bank in Sonora; that the deceased drew from the money deposited in bank and used for his own purposes the sum of about $30 a month; that at the time of the death of the deceased there was in the bank to the credit of the mother, as proceeds of the operation of the ranch, the sum of $1,200, accumulated during the period of the deceased's management. There was also testimony introduced to the effect that during the busy season ranch-hands were paid from $4 to $5 per day; that the compensation of the foreman of a ranch was from $100 to $130 per month. At the time of the trial the mother of the deceased was 67 years of age. The deceased was in good health, able-bodied, industrious, considerate of his mother,

with whom he resided.   The mother of the deceased had two
sons, the deceased, unmarried, and a married son named
John J. Rocca.   There were several sisters, all married but
one.   The testimony does not show that the son ever con-
tributed any actual cash to the support of his mother, nor
what the arrangement, if any, existed between the mother
and the deceased relative to his management of the ranch.
It simply sets forth that he was in charge of the 600-acre
ranch, upon which grain and hay, garden products, and
fruit were produced, poultry raised, and a limited number
of cattle and hogs, and the amount of money usually paid
for like services rendered by others.   The life tables shows
an expectancy on the part of the mother of ten years, dating
from the day of the trial.

As grounds for reversal of the judgment in this case, the
appellant urges: 1. That the complaint fails to state a cause
of action in that it contains no allegation that the mother was
dependent upon her son for support and that there is no
allegation as to damages, save and except the general
statement that the plaintiff was injured in the sum of
$15,000; 2. That the death of Lige William Rocca was the
result of inevitable casualty and not of any negligence on the
part of the defendant and that the deceased himself was
guilty of contributory negligence; 3. Erroneous instructions
given to the jury by the court, and, finally, that the judg-
ment is excessive.   The appellant also moved for a nonsuit
on the ground that the testimony did not show any negli-
gence on its part.   We do not find anything of merit in the
appellant's contention that the complaint does not state a
cause of action.   The questions presented by appellant's
motion for a nonsuit may be treated generally in considering
the question of negligence, if any, shown in this case.

The testimony shows that there is no mechanical appliance
that will indicate the mere fact of a sagging wire; that there
are mechanical appliances which indicate the circumstance
of a broken wire, or of a wire becoming grounded; that the
appliances of this character were used by the defendant
company and that had the wire in question broken and reached
the ground, the company would have been advised thereof im-
mediately.   The testimony further shows that the accident in
question occurred some time between 2:30 A. M. and 5 A. M.
of January 30, 1922, and at an hour when the App Mine

road is seldom frequented and at a time when it is reasonable to infer that the lines of the company were not usually being inspected. Whether the storm in question was of that severity which would have induced an ordinarily prudent person to inspect the power line carrying a highly dangerous voltage to ascertain if any damages were being done thereto does not appear to have been directly presented one way or the other in the trial of this case. It may be here stated that the power line causing the death of the deceased carried 2,300 volts of electricity.

The question of negligence in this case depends upon a combination of factors: 1. Was the leaning position of the pine tree referred to herein and the overhanging limb which broke away therefrom and fell upon the power lines maintained by the defendant so near the power lines belonging to the defendant and in such a position as to induce an ordinarily prudent person to take precautions against injury resulting from damage that might be inflicted upon the tree by the usual winter storms, reasonably to be anticipated in the mountainous country where the lines were maintained? 2. Also, could the cracked condition of the limb, as shown by the scar after the limb had been wrenched away from the parent tree, have been discovered had any reasonable effort been made to ascertain the condition thereof? 3. Also, whether the distance between the poles on which the wires were strung was so excessive as to permit the bringing down to the earth of a line swung on a crossarm about 30 feet in height to within six inches of the ground at a point only 19 feet from the base of the pole? 4. Also, considering the leaning position of the trees and the overhanging limb, would or would not ordinary care and precaution have suggested to the defendant the advisability and reasonable necessity of erecting a pole between pole B and the App Mine road, so that if the tree or a limb thereof did fall upon the power lines, it would fall upon a span not swung across the App Mine road? The testimony shows that the spans in the line maintained by the Pacific Gas and Electric Company in the same neighborhood were very much shorter in length. The voltage carried by the Pacific Gas and Electric Company does not appear in the transcript. Much stress is laid upon the fact by the appellant that the broken limb was carried over the telephone wires which were between

the tree and the power lines belonging to the defendant. The telephone lines, however, were much lower and owing to the leaning position of the tree would tend to carry the limb over the telephone wires, even though the storm was not of unusual severity.

In the argument of this case our attention has been called to a number of cases. We will review the same, so far as pertinent, and also some cases not cited in the brief. In Curtis on the Law of Electricity, section 497, it is said generally: "Electric companies, not being insurers against accidents from their appliances, are not liable for injuries resulting from an act of God or inevitable accident. The basis of the company's liability is its negligence; but the sagging of wire, under the doctrine of *res ipsa loquitur*, is generally held to make a *prima facie* case of negligence which requires the company to give evidence that the sagging was not the result of its negligence. . . . If the sagging of its wire is occasioned by a cause for which it is not responsible, and it detects the trouble with promptness, and immediately pursues the proper steps to remedy the situation, it is not chargeable for an injury to another by reason of the sagging of the wire. . . . Whenever electric or other wires are maintained in such a location that it may be reasonably anticipated that the sagging thereof will cause injury, the one maintaining the wire must use due care to prevent the sagging thereof. Due or commensurate care in the case of high-tension electric currents means a very high degree of diligence. If a wire strung along or across a highway is negligently permitted to sag so that a traveler is injured thereby as a general proposition, the company maintaining the wire is liable for the resultant damages."

[1] The pine tree referred to herein stands upon private property, but the argument based upon that fact by appellant is untenable and does not relieve the company from liability for failure to protect its wires or take the ordinary precautions which the circumstances demanded. In *Hagerstown & Frederick Ry. Co.* v. *State of Maryland, for Use of Bruce A. Weaver,* 139 Md. 507 [19 A. L. R. 797, 115 Atl. 783], the law on this question is thus stated: "An electric company maintaining high-tension wires beside a highway is not relieved from the duty of protecting the wires against the decayed limb of a tree which overhangs them, by the fact

that they are on its own property, and the tree is on private property of another, if the fall of the limb is likely to break the wires and endanger persons passing along the highway.'' In this case the poles belonging to the company were just inside and adjacent to a wire fence on the west side of the highway. The road or highway was about 30 feet wide, and standing just inside the fence on the opposite side of the road was a weeping willow tree from five to six feet in diameter; a larger limb of this tree extended out over the highway. This limb broke away and fell one evening, and in its fall struck and broke one of the transmission wires belonging to the company. This wire came in contact with the wire fence just referred to, and a minor child of the respondent touched this wire fence and was killed. The court, in considering the facts thus presented, declared the law as we have stated and said further: ''The obligation of such companies to exercise proper care is not determined by their right to construct and maintain their lines, but rests upon their duty to protect others while in the lawful exercise of their rights. As we have said, there was evidence tending to show that the appellant, by the exercise of proper care, could have known that the tree was decayed, and that the limb that gave way would probably fall and break its wire, and that it did nothing either to protect its wires or to protect the public from injury that might be caused by a fallen wire. To hold that the appellant was relieved from all obligation or duty to the public simply because the tree stood on private property would deprive those lawfully and properly using the highway of the protection they were entitled to. . . . The appellant's line was on its private right of way where the appellant had a right to construct and maintain it. But it was also along a public highway, where the public and the little child that was killed had a right to be, and the company was therefore required, in maintaining its line, to exercise that high degree of care commensurate with the danger to which it exposed those using the highway. If the proximity of its line to the decayed tree rendered the highway unsafe for the use of the public, it was the duty of the appellant either to have the limb removed, or to exercise proper care to protect its wires, and, if the injury complained of was the result of its failure to discharge that duty, it should be held liable.'' [2] In *Boyd* v. *Portland*

*Gen. Elec. Co.,* 40 Or. 126 [57 L. R. A. 619, 66 Pac. 576],
a case having to do with a wire broken by storm, the court
said: "An electric-light company is not relieved from lia-
bility for injuries by wires broken by a storm, unless it was
one which could not reasonably have been anticipated." In
*Warren* v. *City Electric Ry. Co.,* 141 Mich. 298 [104 N. W.
613], where a telephone wire received a dangerous current
from a trolley wire by being pressed down on to a trolley
wire by a limb of a tree which was broken down by a severe
storm, the court, in considering the subject of inevitable
accident and the claim that the wire was not properly con-
structed, used this language: "In this connection it is urged
that the proximate cause of the injury was not the want of
insulation, nor the failure to guard the span wire, but it
was the breaking of the tree. It is generally the case that an
accident is the result of concurring causes. If the rain and
snow never fell and the wind never blew, wires would be less
likely to fall and break. . . . All of these were things to be
anticipated and guarded against. If this was not done to
the extent that a prudent man would do it, there was a
failure of duty, which might be a concurring cause of the
accident, making defendant liable." In *Spires* v. *Middlesex
& Monmouth Electric Light etc. Co.,* 70 N. J. L. 355 [57
Atl. 424], where a wire was broken by a falling limb from
a tree, the court considered the question of the duty of the
company to guard against such occurrences and to protect its
wires from such possibilities and discussed the question in
this manner: "We think the finding of the jury that the
company was negligent was justified by the facts shown.
The wire which was broken crossed the highway diagonally at
the place where the accident happened. The parting of the
wire was caused by the falling upon it of a heavy limb
which had broken from a tree which stood some feet away.
In view of the dangerous nature of a wire charged with a
powerful electric current, corporations using public high-
ways for wires that are so charged should exercise a high
degree of care to keep the wires where travelers will not be
likely to come in contact with them. The likelihood of such
a wire being broken by the falling of the limb of a tree upon
it is much lessened by a guard wire stretched over it and
running parallel with it, and juries are justified, in proper
cases, in holding that such a safeguard is due to the public,

and that 'its absence speaks negligence.'' **[3]** In the case at bar the erection of another pole on the south line of the App Mine road would have given a span of wire adjacent to the leaning tree and underneath the overhanging bough, which would have absolutely protected the public in the use of the App Mine road.   The failure to take any such precautions in the light of the circumstances presented by the tree and overhanging limb are matters of fact going to the question of negligence proper for the jury to consider; also the fact that the spans between the poles were of such great distance and the wire so loosely hung that it could be pressed to the ground so near to a supporting pole.   In *Heidt* v. *Southern Tel. & Tel. Co.,* 122 Ga. 474 [50 S. E. 361], a case having to do with the falling of a tree by a violent storm, the facts showing that it was one which could not have been reasonably guarded against, the court stated the law applicable, following the rule hereinbefore laid down, to wit: ''The electric light company, in the construction of its line, was bound to adopt all reasonable precautions for the protection of the public, to prevent casualties which might be reasonably anticipated.   This obligation would require it to anticipate the influence of the ordinary storms customary to the locality.   But if the falling of the electrically charged wire was caused by a storm of unusual severity, which could not have been reasonably foreseen and its consequences guarded against, the company would not be liable, if it was not otherwise negligent.''   The telephone company and the power company were made defendants in that action. The telephone company was held liable for not having properly guarded its wires and the power company held not liable on the theory that defendant (power company) had taken all reasonable precautions and the storm was not one common to the locality where the wires were erected.   In *Rowe* v. *New York & N. J. Tel. Co.,* 66 N. J. L. 19 [48 Atl. 523], a telephone wire swung above a power wire was blown down during a violent squall and injury occasioned to a boy walking along the sidewalk where said wire reached the ground.   Both companies were held liable notwithstanding the storm, by the reason of the fact that neither company had taken precautions to guard the wires from coming in contact.   In the case of *Smith* v. *San Joaquin etc. Power Corp.,* 59 Cal. App. 647 [211 Pac. 843], the recital of facts

shows that an electric power line strung along the side of a public highway was broken by the leaves of a large palm tree blown against the wire during the storm and the court said: "The defendant pleaded in its answer, and thereafter offered to prove, facts showing or tending to show that the wire which the plaintiff touched was properly in place the night before, that a wind arose, and the leaves of a large palm were blown over against the wire and broke it, and that such facts constituted an act of God. If the facts stated constituted an act of God the defendant should have been permitted to show the same as a defense. However, the respondent contends that the alleged facts do not show an act of God within the proper meaning of that rule. (*Fay* v. *Pacific Improvement Co.*, 93 Cal. 253 [27 Am. St. Rep. 198, 16 L. R. A. 188, 26 Pac. 1099, 28 Pac. 943].) In this behalf he contends that if the palm tree stood in such a position as to endanger the defendant's wire that the defendant should have properly protected its wire therefrom ·and, in failing to do so, the omission was an act of neglect on the part of the defendant, and not an act of God. This contention is supported by the authorities. (*Chidester* v. *Consolidated Ditch Co.*, 59 Cal. 197.)" This case applies the rule of *res ipsa loquitur*. **[4]** In *Diller* v. *Northern Cal. Power .Co.*, 162 Cal. 531 [Ann. Cas. 1913D, 908, 123 Pac. 359], the rule of *res ipsa loquitur* is applied and it is there said: "The fact that a person, while traveling along a public highway, was injured by coming in contact with a highly charged electric wire belonging to an electric light and power company, which was down across the public highway at the point where the accident occurred, raises a presumption of negligence on the part of the company · maintaining the wire." Numerous cases are cited in that case and we think definitely establish the rule as applicable to the case at bar. **[5]** That the evidence does not show any previous breaking of a limb from the pine tree in question is wholly immaterial. The question is, could it have been reasonably anticipated, or, as said in 19 Cal. Jur. 563, "but merely because a particular accident has not happened before does not render it .of that class which may not 'reasonably be anticipated,' for if, in the conduct of a certain business, it should be known that unusual or uncommon danger must necessarily coexist with certain conditions, responsibility at-

taches for a failure to control such conditions. And where injury could reasonably have been anticipated it is not a prerequisite to liability that the wrongdoer should be able to anticipate the precise form of the consequential injury. Whether an injury should have been anticipated by defendant as the result of his negligent act depends upon the facts and circumstances of each particular case, and is ordinarily for the jury to determine.'' See, also, *Teale* v. *Southern Pac. Co.*, 20 Cal. App. 570 [129 Pac. 949], where this rule is held to apply, even though no previous accident had occurred. The law applicable to cases involving circumstances which we are here considering is clearly set forth in the case of *Fairbairn* v. *American River Electric Co.*, 170 Cal. 115 [148 Pac. 788], from which we quote the following: ''The companies are not insurers of the safety of the public against all dangers arising from the lawful placing in the street of appliances pertaining to the business carried on by them, but they are bound to know the danger which may naturally be caused by such use of the streets, and to guard against them by the exercise of all the foresight and caution which can be reasonably expected of prudent men under the circumstances.' (1 Joyce on Electricity, sec. 438; *Denver* v. *Sherret*, 88 Fed. 233 [31 C. C. A. 499].) 'The degree of care required of such companies, under the rule that they must exercise reasonable care, varies according to the facts and circumstances of the case, having in view the serious results which may ensue as a consequence of negligence.' (1 Joyce on Electricity, sec. 438a.) The standard to be attained is that of ordinary and reasonable care, and this means such care as a reasonably careful and prudent person, having in view the dangers to be avoided and the likelihood of injury therefrom, would exercise, under the circumstances, in order to prevent injury. Where death may be caused by an agency lawfully in use, ordinary care requires that every means known, or that with reasonable inquiry would be known, must be used to prevent it.'' The verdict of the jury necessarily included the finding upon conflicting testimony that the storm was not unusual, and, therefore, one that should have been reasonably apprehended, and that finding is conclusive upon appeal.

[6] We think that the foregoing *résumé* of the testimony and law applicable to this case shows that the denial of the

defendant's motion for a nonsuit was proper; that the question of negligence on the part of the defendant in not properly maintaining its wires and guarding the same against dangers reasonably to be apprehended was one properly to be submitted to the jury; that the rule of *res ipsa loquitur* applies and that the cases of *Kleebauer* v. *Western Fuse & Explosives Co.*, 138 Cal. 497 [94 Am. St. Rep. 62, 60 L. R. A. 377, 71 Pac. 617], and *Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363 [64 Pac. 480], have no application, as they do not involve safeguarding against impending dangers.

[7] At the request of the plaintiff, the court instructed the jury as follows: "If you believe that the defendant so constructed and maintained its electric pole lines and power wires that a pine tree was permitted to be and remain sufficiently near said power line that a limb from said tree extended over and above said power wires of said defendant, and that said limb under weather conditions that were not unusual for said season of the year in said locality, fell upon the electric power line of said defendant and placed said line sufficiently near the ground as to cause said power line at the point where the same crossed the App Mine Road to reach a point sufficiently near the ground that the deceased Lige William Rocca, in walking along said road without negligence or fault upon his part, walked against or came in contact with said wire, and as a result thereof was killed, and that the killing of said deceased was due to the negligence of said defendant in the manner and place of the construction and maintenance of its electric power lines, when considered with reference to said tree and overhanging limb, then I instruct you that the defendant would be liable in damages to the plaintiff herein." Taken by itself, it may be seriously questioned whether this instruction sets forth the law correctly. It is certain that it does not set it forth in very clear language. There is nothing in the instruction relating to whether the dangers impending could have been reasonably apprehended or safeguarded against, but read in connection with instructions immediately following, the ambiguity and error, if any, involved in said instruction are corrected and cleared up, as the jury is immediately advised in the following language: "The jury is instructed that the defendant is charged with the duty of so placing its wires

and keeping and maintaining them, with reference to adjacent trees and limbs, as to protect said wires in reasonable safety against the danger of being broken or disturbed by falling limbs under ordinary seasonable weather conditions in the locality where said wires were maintained; and said defendant is charged with the duty of keeping in mind and protecting its power lines in reasonable safety against, the ordinary consequences that may result to adjacent trees or over-hanging limbs from the ordinary seasonable weather conditions in the locality—including rain, snow, heat, cold and wind." The jury was also instructed that they were to take into consideration all the circumstances and facts which we have hereinbefore set forth, which gave them a full idea of what they were to pass upon. At the request of the defendant, the court gave a number of instructions, among which we find the following: "If you find from the evidence and believe that said storm and wind was the sole cause of the breaking of said limb off said tree, and said limb was sufficient in weight to cause said wire being sagged to or within about three feet of the ground at the point where the body of Lige Rocca was found and if you should further find from the evidence that defendant was not negligent in the construction or maintenance of its power line then I charge you that your verdict should be in favor of defendant." "I further charge you, that before a verdict for any sum can be found against defendant you must find from a preponderance of the evidence that the death of Lige Rocca was caused by the negligence of the defendant in not properly having constructed said line of power wire leading from Jamestown to Stent or by the negligence of defendant in not having on January 30th, 1922, properly maintained said wire at a point where a road leading from the App Mine intersects the highway leading from Jamestown to Stent." In view of these instructions and others which were given at the request of the defendant, which fully presented to the jury all questions of negligence on the part of the defendant, the dangers to be apprehended and the conditions surrounding the maintenance of the wire and whether the storm was a usual one occurring in that locality, or was of unprecedented violence and of a degree and force not to be reasonably apprehended, we cannot conclude any prejudicial error

was committed by the court, and, therefore, section 4½ of article VI of the constitution must be held as applicable.

[8] It is finally insisted that the verdict is excessive. That section 377 of the Code of Civil Procedure, as applied to this case, does not permit the jury to take into consideration the pecuniary value and, therefore, the pecuniary loss, of the comfort, society, and protection afforded the mother by her son. In this contention, however, the appellant is not borne out by the facts. The evidence shows that the mother, a widow, and a son were living together upon the mother's ranch; that the son had taken charge of the ranch and that the mother consulted with the son in the management of her properties and depended upon the son for his management, control, and operation of the ranch properties, and as well was enjoying his society, comfort, and protection at her home. It is not a case where an adult child is living away from home and is not contributing anything in the way of society, comfort, and protection to a parent. The life expectancy of the mother in this case, as shown by the tables, is about ten years, and while there does not appear anything in mere dollars and cents as to the contributions made by the son to the support of his mother, it does appear that he was managing the ranch in question, and apparently showing a profit in the management thereof. Whether the son was entitled to draw down and expend for his own uses and purposes more than $30 a month is not shown by the testimony. The value of the son's services, however, may be reasonably inferred from the testimony as to the ordinary wages paid for like services. This is not all, however, that the jury was entitled to consider, because in the management of the ranch property, skill, knowledge of conditions and industry are important factors and especially the interest in the property, its care and development are highly important. These were factors entering into the profit reasonably to be expected by the mother in having her properties looked after by one who was capable, industrious and interested. In considering the value of these factors and arriving at a just conclusion thereof, we are of the opinion that the jury would arrive at as nearly an accurate approximation of the damages suffered as could be determined by any court. Of course, it cannot be said that the son would live with the mother and manage the ranch and afford all the

profitable matters, which we have herein set forth, during the entire period of her life expectancy, neither could it be said that he would not do so. In considering these probabilities, the supreme court, in *Parsons* v. *Easton,* 184 Cal. 764 [195 Pac. 419], said: "In the absence of anything to the contrary, the presumption would be that the benefit to the parents from the son, if any, would have continued during her survivorship (referring to the mother) the same as during the lives of both of them. Hence, it is proper to consider the value in money of the benefits which, from all the circumstances of the case, the parents might be reasonably expected to derive from the son during their expectancy of joint life and for the remainder of the mother's life expectancy, assuming that the son's life would have continued for that period." From this it follows that if the pecuniary value of the son to the mother in the management of her property was the sum of $1,200 per year and her life expectancy was ten years, her loss in dollars has been the sum of $12,000. To be sure, this is not considering the present worth of the sum involved paid annually in installments of $1,200. Here, however, another element enters into the case and that is the pecuniary value, and hence the pecuniary loss of the society, comfort, and protection. Our attention has not been called to any rule by which such damages may be mathematically calculated. Such damages must be determined by the enlightened judgment, either of the jury or the court, and, as we have said, we know of no rule which indicates that the judgment of the court is more likely to be accurate in such matters than the determination of the jury.

[9]   Again, an appellate court is entitled to interfere and set aside a verdict of a jury on the grounds of the damages allowed being excessive, only when it appears that improper causes have led to the verdict. The language of this court, speaking through Presiding Justice Chipman, in *Slaughter* v. *Goldberg, Bowen & Co.,* 26 Cal. App. 318 [147 Pac. 90], states the rule and refers to the cases considering the same. We quote therefrom the following: "There is no evidence aside from the amount of the damages, from which it can be inferred that the jury were actuated in the slightest degree by passion, prejudice, or by corrupt motives. The amount in itself is not such as 'to suggest at first blush,

passion, prejudice, or corruption on the part of the jury.'
(*Hale* v. *San Bernardino etc. Co.,* 156 Cal. 715 [106 Pac.
84] ; *Bond* v. *United Railroads,* 159 Cal. 270, 286 [Ann. Cas.
1912C, 50, 48 L. R. A. (N. S.) 687, 113 Pac. 266].) This
subject has been so frequently discussed by our appellate
courts and under so many different conditions of facts
that it would be difficult to throw any additional light upon
it. We can discover no rule of law which would warrant
our holding the verdict in the present case to be excessive
and we content ourselves with referring to some of the cases,
in addition to the two above cited, which we think fully
justify our conclusion: *Redfield* v. *Oakland Con. Co.,* 110
Cal. 285 [42 Pac. 822, 1063] ; *Hillebrand* v. *Standard Bis-
cuit Co.,* 139 Cal. 233 [73 Pac. 163] ; *Skelton* v. *Pacific Lum-
ber etc. Co.,* 140 Cal. 507 [74 Pac. 13] ; *Bowen* v. *Sierra Lum-
ber Co.,* 3 Cal. App. 313 [84 Pac. 1010] ; *McGrory* v. *Pacific
Elec. Co.,* 22 Cal. App. 671 [136 Pac. 303].'' This question
was before this court in the case of *Eldridge* v. *Clark &
Henery Construction Co.,* 75 Cal. App. 516 [243 Pac. 43].
The opinion in that case quotes from Graham & Waterman
on New Trials, page 451, the following pertinent language:
''It is clear that the reason for holding the parties so
tenaciously to the damages found by the jury in personal
torts is, that in cases of this class there is no scale by which
the damages are to be graduated with certainty. They admit
of no other test than the intelligence of a jury, governed by
a sense of justice. . . . '' This applies to all that part of
the judgment in this case which rests upon the rule that
damages may be allowed for the pecuniary loss, following the
deprivation of society, comfort, and protection. Again, if
we were to conclude that the judgment is excessive, we have
nothing before us upon which to reasonably predicate such
a statement. The figures furnished by the appellant, calcu-
lated upon the present worth of the damages allowed, cannot
be taken as a guide, because the appellant has proceeded upon
the theory that the mother has suffered no pecuniary loss on
account of being deprived of the society, comfort, and pro-
tection of the son, or his judgment in the management of the
property, or of their relationship being such as to induce
her to place confidence in his judgment and to look to
him for guidance, comfort and protection. These are valu-
able items to a woman 67 years of age, who has no other

unmarried son to take charge of her property, and is, perforce, required to look elsewhere and possibly to strangers for a ranch manager possessing the necessary qualifications shown to have been possessed by the son. Every man on the jury, having knowledge of the management of ranch properties, appreciates the difficulty of obtaining a competent manager, and is, perhaps, by training better qualified to estimate this loss than either trial or appellate court. A review of the cases upholding and setting aside verdicts on the grounds of being excessive, would not serve any useful purpose, and we content ourselves with a statement that no sufficient reason has been presented to us for setting aside the verdict on any such grounds.

Other objections urged in appellant's brief in relation to instructions, the admission of testimony, and the sustaining of objections which we have considered and found untenable are not set forth in this opinion, because it would unduly lengthen the same.

The judgment of the trial court is affirmed.

Pullen, J., *pro tem.*, and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 19, 1926.

Lennon, J., dissented.