[Civ. No. 3177. Third Appellate District.—January 25, 1927.]

MARIE HELFER, Respondent, v. Dr. J. M. GLAZE, Appellant.

[1] NEGLIGENCE—PEDESTRIAN INJURED BY FALLING AWNING—EVIDENCE —FINDINGS.—In this action for damages for personal injuries sustained by a pedestrian, when struck on the head by an iron awning frame which fell from a hotel building, the evidence was sufficient to support the finding that plaintiff was injured by the falling awning.

[2] ID.—MAINTENANCE OF AWNING—FINDINGS—EVIDENCE.—In such action, the evidence was sufficient to warrant a finding that the awning was maintained in a negligent manner.

[3] ID.—INSTRUCTIONS—EVIDENCE.—In such action, in view of evidence showing that defendant owned the hotel and everything therein and that he employed a manager to maintain it, the trial court did not err in refusing to instruct the jury at defendant's request that the premises were leased at the time of the injury.

[4] ID.—VERDICT—EVIDENCE.—In such action, it is held that a verdict of $6,000 for injuries sustained by plaintiff was not excessive,

where they were shown by the evidence to have been of a permanent character and that $1,812 thereof was traceable to special damages for medical attention and loss of earnings.

(1) 28 **Cyc.**, p. 1494, n. 89.    (2) 28 **Cyc.**, p. 1494, n. 89.    (3) 38 **Cyc.**, p. 1619, n. 38.    (4) 4 **C. J.**, p. 872, n. 15; 17 **C. J.**, p. 1114, n. 98.

APPEAL from a judgment of the Superior Court of Los Angeles County.    Walton J. Wood, Judge.    Affirmed.

The facts are stated in the opinion of the court.

Earl L. Wisdom for Appellant.

Goodwin J. Knight for Respondent.

PLUMMER, J.—This action was tried before a jury resulting in a verdict in favor of the plaintiff in the sum of $6,000.    From the judgment entered thereon the defendant appeals.

The complaint alleges that on or about the fourteenth day of July, 1923, the defendant owned, maintained and controlled the Merritt-Jones Hotel in the city of Santa Monica, that the defendant, by his agents and employees, kept and maintained over a large window fronting on Marine Avenue, a public street in said city, a large awning for the purpose of shading said window; that the frame of said awning was maintained in such a careless and negligent manner that it became loosened and on or about the fourteenth day of July, 1923, while so negligently and carelessly maintained, fell without warning and struck the plaintiff upon her head; that the plaintiff, without any negligence or carelessness on her part, was walking along the sidewalk adjoining said street and over which said awning was so carelessly and negligently maintained by the plaintiff, and that, while so walking along said sidewalk, the frame of said awning, in its fall, struck her upon the head; that the suddenness and force of the blow of the iron frame of said awning felled her to the ground, rendering her unconscious.    The plaintiff further alleges that by reason of said injury plaintiff was rendered sick and sore throughout her whole body, suffering concussion of the brain and traumatic neurosis (a nervous trouble in this case arising from a wound upon the head).

The complaint then proceeds to allege certain special damages, such as loss of compensation for her services and that she had been unable to engage in her usual employment for a long period of time, that she had incurred certain expenses for medical attendance, medicines and also certain expenses for the attendance of nurses.

The defendant denied: 1. The alleged careless and negligent manner of maintaining the awning in question, denied that it fell upon the plaintiff, and, as a special defense, alleged that the premises in question were under lease to other parties.

Upon this appeal, the defendant presents for our consideration four questions: 1. The insufficiency of the evidence to warrant a finding that plaintiff was injured by the falling awning; 2. That the evidence is insufficient to warrant a finding of negligence; 3. That the court erred in not instructing the jury that the premises were leased; and 4. That the damages awarded are excessive.

[1] In support of the first assignment the appellant lays the premises of his argument upon the statement that the awning which fell, and by the falling of which the plaintiff alleges she was injured, was maintained over the northerly, instead of over the southerly one of two large windows in the front of said hotel building, and was so far away as not to be within the range of vision of two witnesses seated near by in a bootblack-stand in the recess adjoining the front of said hotel building adjoining the sidewalk along which the plaintiff was walking. An examination of the exhibits and of the testimony in this case shows that the appellant is in error in laying down the premises for his argument. The awning that fell is shown beyond any reasonable contradiction to have been the one maintained over the southerly window of the front of said hotel and within a very few feet of the bootblack-stand, readily visible to anyone seated thereon while having his shoes shined. There is some doubt left in the testimony as to whether the southerly or the northerly end of the irons which fell came nearest to the ground. This difference in the testimony of the several witnesses, however, is utterly immaterial, because whether it was the iron supporting the southerly end or the northerly end of the awning which came closest to the sidewalk, if either struck the plaintiff upon the head, as alleged by

her, the witnesses seated in the bootblack-stand, as stated by them, had a sufficiently clear vision to see what was taking place, if by any means their attention was called thereto. The awning was stretched on canvas with the roller at the top upon which the canvas was rolled up when the awning was raised and having an iron tube or iron around the lower portion thereof to give the canvas extension out over and far enough from the window to give shade and protection from the summer sun. Some of the witnesses described this iron rod or pipe as being three-fourths inch in diameter. There seems to be no question raised as to the fact that the iron pipe used in the lower portion of the awning to give extension thereof was of sufficient weight to strike a very severe blow in the event of its fall.

The witnesses L. B. Farman and J. J. Hartman testified as to seeing the awning in its fall strike the head of the plaintiff. Hartman's testimony is, in substance, as follows: "I know where the Merritt-Jones Hotel is situated, I know the cigar-stand next door to it, I have friends in that neighborhood. During the past six years I have been frequently in the neighborhood of the hotel; I know the location of the shoe-shining stand. It is next door to the hotel; I worked at the hotel when it was being built, have known the owners and operators of the hotel from time to time; the picture shown me is a fair representation of the front portions of the Merritt-Jones Hotel on Marion Avenue; the large window is in front of the cafe; I was sitting on the shoe-shining stand somewhere between three and four o'clock on the afternoon of July 14, 1923, first chair from the street; I could see all the front part of the awning, I was looking up toward the Pacific Electric car; I saw the plaintiff, Miss Helfer, on that day, I saw her and another woman coming down the street, just as they got at that corner, the awning fell on them; I saw the awning just as it struck the woman's head; there was no man with Miss Helfer; no one pulled the awning down, there was no one near the awning except those two women."

The witness Farman testified that he saw the awning frame strike the plaintiff on the top of the head; that after the injury he saw the awning frame torn loose from the building; that no one pulled the awning down; that the plaintiff was in the position of a passer-by on the street.

This witness testified that he was looking at the two women when they walked along the sidewalk, that when they came in front of the Merritt-Jones Hotel, he saw the awning fall and hit the plaintiff on the head, that it was the awning frame that hit the plaintiff. The witness then identified the window from which the awning fell, that the plaintiff was looking down toward the beach at the time she was struck by the falling awning. In view of this testimony, it seems unnecessary to consider further appellant's argument that there is no testimony to support the finding by the jury that the plaintiff was struck by the falling awning.

[2] Upon the question of the awning being maintained in a negligent manner, the witness D. B. Young, called by the defendant as an awning expert, on cross-examination, testified that when the awning is maintained in a normal manner or condition, it would not come down below a distance of eight feet from the sidewalk; that it would not be possible to come down to within about four feet of the sidewalk, if maintained in a normal condition; that it cannot come down to within four feet of the ground if in good condition.

The defendant's witness Seeley, the engineer for the hotel building, testified that he was called to attend to the awning, that the awning was in front of the dining-room, that he found it running down on an angle, one end right up as it would be and the other was down to four feet and was drawn away from the side of the building. The slide that goes up and down, that holds the awning, was torn. The awning covering was partly torn off; that he took the awning frame down and put it in the basement; that he did not pull it up because it was practically torn off; that he had orders to take it down, one end of it was practically torn off, it was not in a normal condition. ''I got my orders from the superintendent of the building, I did all the repairs to the hotel. It is my duty to make inspections, my duty was to inspect everything, the rooms, bathroom, down stairs, engineer's room and everything around in general, including the awnings.''

The witness R. A. Worthy, on cross-examination, testified that he was familiar with the awning in front of the cafe, that he tried to get the awning down, that something held it, he did not know what; that when he found it would not

work, he just left it there; that he did not look any further when it did not come down.

The defendant's witness Mead, on cross-examination, testified that he saw the awning some time between 3:30 and 3:45 P. M., that the end of the awning nearest the ocean was normal, the one nearest the hotel door had dropped about two feet, the canvas was torn on this end of the awning and it had dropped as much as the pipe, of which it was constructed, would allow, that is, the flexibility of this pipe would allow one end normally to drop lower than the other.

H. P. Knight, a witness for the defendant and manager for the hotel, likewise testified that he saw the awning in front of the cafe the afternoon in question; that when he saw it, it was out of place, one corner hanging down, looked like somebody had run into it; it was the corner nearest the cafe door; that he did not notice the canvas covering at the time; that the end he was speaking of was down to about four or five feet from the sidewalk, the other end was at an angle running up. "As soon as I saw the condition, I thought it had better be taken down, gotten out of the way; somebody might run into it; I went downstairs and told the engineer to have it removed."

Mr. Hoegee, a witness for the plaintiff, testified that he had seen the awning and the roller on which it operated, that he would regard the frame and awning as in a dangerous condition, that awnings of this kind fall when they are not taken care of; that the awning was not in first-class condition, it was pretty old; it had not been taken care of, it was rusted from the salt air.

We do not need to follow the testimony any further to show that plaintiff's second contention is without merit.

[3]   As to the third ground of appeal that the premises were leased and were not under the management of the defendant, the record shows, among other things, the following (testimony of William Seeley) : "I am the engineer of the Merritt-Jones Hotel, I was working in that capacity in July, 1923; I know the awning in controversy; I had been working for the hotel for over two years; I did all the repairs around the hotel; it was my duty to make all the inspections, I was employed by Dr. Glaze, he paid my salary; it is my duty to inspect the awnings every day; I was always around the hotel outside and inside; it was my duty to look after

the repairs. I took the awning frame down and put it in the basement; I took it down because the awning was practically torn off; I had orders to take it down; I got my orders from the superintendent, Mr. Knight.''

Mr. Knight, a witness for the defendant, testified as follows: ''I was manager of this hotel for Dr. Glaze; Mr. Worthy was operating the cafe. A percentage of the receipts was paid to Dr. Glaze which was operated under that kind of an agreement, there was no lease.''

The evidence of Mr. Worthy was to the effect that Dr. Glaze was the owner of the cafe, owned the tables, silverware, etc.; that Dr. Glaze had a certain percentage of the net receipts.

Dr. Glaze, the defendant, testified that he owned the hotel and everything herein referred to. This testimony clearly shows that the jury had a right to conclude that the defendant Glaze controlled, operated, managed, and had the general supervision of everything involved in this action, and that the cases which turn upon the liability of a landlord for the negligence of his tenants are inapplicable, and need not be reviewed in this opinion.

At the request of the defendant, the court gave the following instructions to the jury:

Instruction No. 13: ''If you find that the awning in this case was, at the time of the alleged injury under the exclusive care and control of another person, not the servant or agent of the defendant, then you must find on the issues for the defendant.''

Instruction No. 14: ''If you find that the awning in this case was, at the time of the alleged injury under the joint care and control of another person with the defendant, then you must find if any negligence existed at the time of the alleged accident in its maintenance, whether or not such negligence can be imputed to the defendant, and if not, then that he is not liable.''

We do not need to inquire whether the second of these instructions is correct, because it was given at the request of the defendant and the two instructions taken together certainly presented the law as favorably to the defendant as he could ask under the theory that he was not responsible for the condition of the awning.

[4] The fourth assignment of error involves the amount of the verdict. Before considering the question of whether the verdict is excessive, we may state that the testimony shows sufficient to justify the jury in finding the following special damages, to wit: Expenses for attending physicians in the sum of not less than $282, medicines $70, loss of earnings at the lowest figure of $100 per month, given as the earning capacity of plaintiff, eleven months $1,100, and attendance of nurses, $350.

Thus we have slightly over $1,800 direct and readily ascertainable losses on the part of the plaintiff. The verdict is for the lump sum of $6,000, which, excluding the items which we have mentioned, leaves a trifle less than $4,200 to cover the physical injuries suffered by the plaintiff.

The trial was had twelve months after the injury. At that time the plaintiff testified that she had not yet been able to do any work; that she was suffering a great deal from headache and from nausea or fainting spells; that she suffered considerably from dizziness or fainting spells; that since the injury she had not been able to attend to her usual employment; had not been able to go out anywhere; that she had suffered relapses; that her nervous condition did not seem to improve; that she had had several severe nervous attacks; that she suffered at times from loss of memory.

Dr. J. Mather, her attending physician, testified that he found the plaintiff in a semi-conscious condition when he first called; that he found she was suffering from traumatic neurosis; that she was suffering from fainting spells, had a great deal of pain in her head, fainting spells and nausea; that the plaintiff at the time of the trial was not a well woman; that in cases of traumatic neurosis symptoms in some may appear much greater than in others. "Though the condition of traumatic injuries is this that comes from the exhaustion; there is a functional nerve condition of the general system; that may be some better; sometimes they have a relapse, have a great deal of excitability"; that in this case the concussion was an injury to the brain. The witness further testified: "In considering the fact of the number of months that have elapsed since the injury, I believe the injury to a large extent to be permanent." To the same effect was the testimony of Dr. Parkin.

In respect to the suggestion of the defendant that the plaintiff· was shamming her nervous injuries, both these witnesses testified that in their opinion and experience with the patient, such was not the case. Both these doctors also testified that the injury which the plaintiff had suffered was very similar to what is called shell shock suffered by soldiers in the World War.

Dr. Parkin also testified that while patients recovered from this injury, "the majority recover so as to be able to work, but, on the other hand, that same majority are subject to relapses under stresses, strains, that formerly would have been inadequate to have produced any disability"; that it is necessary for such patients to take precautions against strains or anything which would tend to bring on a relapse.

As tending to combat this testimony, the defendant introduced the testimony of Dr. Harding to the effect that the injury was slight; that there was no permanent injury and that, when he was called to examine the patient, she emitted no groans indicating pain; that he called the evening after the accident, but did not see her again until the·time of the trial; that this was a case susceptible of complete recovery, and that in his opinion the condition did not resemble that of shell shock; that he had never had a case of traumatic neurosis where the injury was to the brain.

Mrs. Margaret Eicholz testified that the plaintiff was compelled to remain in bed about two months after the accident; that she was very nervous, could not control herself, and that her head shook considerably as though she had the palsy; that she suffered from nausea or fainting.

Miss Kate Hegel testified as to the nervous condition of the plaintiff; that she could not sleep and had fainting spells; that was her condition in January after the injury in July; "I took care of her for some time."

We think the foregoing testimony shows a substantial injury to the plaintiff and also justified the jury in coming to the conclusion that the injury suffered by the plaintiff is, as stated by one of the physicians, one of a permanent character. Our attention has not been directed to anything in the case which would indicate that the jury was actuated by any malice or prejudice, or under anything whatever, other than a desire to reach a just and correct conclusion. Excluding the $1,812 covering items which we have men-

tioned, the remainder of the verdict allowed to cover the damages suffered by the plaintiff on account of her physical injuries, does not impress us as being excessive, or indicate that the jury was actuated by any improper motives. Much learning has been expended and much time consumed in writing opinions as to when appellate courts may or may not interfere with the verdict of jurors on the ground that the award of damages is excessive. It would serve no useful purpose to re-state the law on that subject. This court recently in the case of *Rocca* v. *Tuolumne County Light & Power Co.*, 76 Cal. App. 569 [245 Pac. 468], had occasion to go into this question very carefully and it is sufficient to refer to the authorities there cited showing that there is nothing in this case which justifies interference with the verdict of the jury on the ground that the award is excessive.

No other questions being tendered for our consideration upon this appeal, it follows from what we have said that the judgment of the trial court should be and the same is hereby affirmed.

Buck, J., *pro tem.*, and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 24, 1927.